UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO: 04-10231-MLW |
| | : | |
| MICHAEL O'NEILL | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Michael O'Neill appeared before Your Honor on June 23, 2006, and pleaded guilty to Conspiracy to Commit Wire Fraud; Wire Fraud; Mail Fraud in violation of Title 18 U.S.C. §§ 371, 1343, and 1341. There is no plea agreement other than the government's letter to the Court with its loss assessment of $2.8 million to CIT. The defendant is free to argue for less.

**Unresolved Guideline Issues**

Inasmuch as the Court's procedural order requires this memorandum to be submitted prior to the Probation Addendum's submission, as of this writing the defendant's objections to the presentence report remain unresolved. Rather than repeat the objections here, the defendant refers the court to his objections and asks the court to resolve the objections. Briefly, the defendant submits he is accountable for CIT loss totally $1,551,018. There is no evidence the offense involved sophisticated means. The defendant did not abuse a position of trust. Furthermore, the defendant should be given consideration for having a minor role in the offense. The total offense level after Acceptance of Responsibility is 15.

In any event, the defendant wishes the court to consider an encouraged departure under the Fraud guideline at §2F1.1 (n.11) that states there are occasions when the loss overstates the seriousness of the offense. In this case, the total loss to CIT (whether $1.5 million or $2.8 million) overstates the seriousness of the defendant's contribution to the loss and thus his offense. The defendant received $61,000 in kickbacks and nothing as a result of the fraud. Moreover, where enhancements are sufficiently distinct to escape the vice of double counting, but nonetheless substantially overlap (such as more than minimal planning, sophisticated means, abuse of trust), the overlap can over-punish defendants in a manner and degree not contemplated by the Sentencing Commission. *See* U.S. v Jackson, 346 F.3d 22 (2d Cir. 2003); U.S. v Lauerson, 348 F.3d 329 (2d Cir. 2003), *adhered to on rehearing,* 362 F.3d 160 (2d Cir. 2004). *See also* U.S. v Kostakis, 364 F.3d 45 (2d Cir. 2004). The defendant agrees that more than minimal planning is applicable to his offense because there was more than one act. (§1B1.1 "More than minimal planning" is deemed present in any case involving repeated acts over a period of time…) But the accumulation of other enhancements raises the offense level to a point that exaggerates the defendant's actual conduct.

**Post-Booker Considerations**

It is now settled law pursuant to *United States v Booker,* 125 S.Ct. 738 (2005), that when imposing sentence the Court must consider the Sentencing Guidelines and Policy Statements. *Booker* requires that in addition to considering the final advisory guideline calculation, the sentencing court is mandated to consider the statutory sentencing factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant.

**Nature and Circumstances of the Offense**

Michael's first job after college was with the Ingersoll Rand Financial Corporation; he stayed with them until 1990, when he joined the CIT Group, rising to become a district sales manager. The CIT Group, Inc. is one of the nation's leading commercial finance companies, founded in 1908, it has offices worldwide with approximately 7,000 employees and claims assets of more than $68 billion. O'Neill's job was to arrange financing for the sale and leasing of vehicles and heavy duty equipment for construction companies; he served as a middleman of sorts, dealing with those engaged in the actual sales and leasing and, upon determining that their applications were in order, passing the paperwork on to his head office at CIT Group.

Among the various companies O'Neil had worked with was Deveau Tractor, based in Syracuse, NY, and owned by Jeffrey A. Deveau, his father, and his brother. During 1994-95, CIT, through O'Neill's work, financed the Samsung line of equipment for Deveau's customers; this relationship ceased when Deveau lost the Samsung line in 1996. In 1997, O'Neill helped finance some other equipment for Deveau Tractor but again his dealings with Jeffrey Deveau then ended. It is important to note that up to that time all the loans arranged through Deveau were in good standing and O'Neil had no reason to believe that Jeffrey Deveau was anything but a legitimate businessman.

The government's 61-page indictment charges (p. 8) O'Neill with involvement in a conspiracy with 6 others all of whom "knowingly and unlawfully conspired and agreed with each other to commit offenses against the United States." Yet within the full 61 pages there is no suggestion, let alone evidence, that O'Neill ever entered into any

3

agreement with any of these individuals except one, Jeffrey Deveau. As to the others, he met with Maggio on only three occasions; the other four individuals indicted as co-conspirators he was introduced to only on one occasion. As for the "overarching conspiracy" described in the 61 pages, O'Neill's name does not even appear in the long explanation of the conspiracy except as a recipient of "kickbacks" and then as the transmitter of false documents to obtain loans.

      O'Neill was evidently not the only sales representative who was deceived. Indeed, Deveau and Maggio were able to create a paper trail that deceived 10 other major national commercial lenders. Moreover, on page 2 of the indictment, the government lists 20 different entities and bank accounts (including alternate names) that were involved in the fraud masterminded by Peter Maggio. (It also lists (p. 7) four dealerships involved in this case of which O'Neil had no direct dealings.) With one exception, O'Neill had no dealings with any of these entities other than Deveau Tractor and Earth Management. The exception apparently was one transaction directly with one of Maggio's straw companies (p. 35), A. Fenno & Sons. Meanwhile, Peter Maggio and Jeffrey Deveau were arranging fraudulent loans with those 10 other commercial lenders—many of them national institutions with the highest standards and most experienced personnel. Michael O'Neil had no dealings with any of these institutions. Thus, it is apparent that he was but a peripheral participant in the conspiracy as set forth in the 61-page indictment. As a minor participant in the overall conspiracy, O'Neill should be given a minor role adjustment to his guideline calculation. The defendant's behavior can be analogized to several circuit cases. *See U.S. v. De Masi*, 40 F.3d 1306 (1st Cir. 1994). (Defendant and his co-conspirators attempted to rob an armored car. The

1st Circuit upheld a three level reduction under § 3B1.2 for a defendant who held between a minimal and a minor role in an offense. The defendant played a limited part in planning the offense, and was less involved than most defendants convicted of conspiring and attempting to rob banks with the aid of firearms. Defendant attended only one of the surveillance meetings, and only served as a lookout for the attempted robbery; *U.S. v. Moeller,* 80 F.3d 1053 (5th Cir. 1996) (Defendant, a state official, was involved in a conspiracy to commit bribery and misapply state funds stemming from the "award" of sham contracts to political consultants. The Fifth Circuit agreed that defendant was a minimal participant in the scheme. He clearly had an inadequate understanding of the contracts-for-politics scheme, as compared to his superiors. His inability to grasp the finer points of the conspiracy was probably the reason he was selected for the role he played. A defendant's lack of understanding or knowledge about the scope and structure of the criminal enterprise is indicative of a minor or minimal role in the offense.); *U.S. v. Hildebrand,* 152 F.3d 756 (8th Cir. 1998). (Defendants were convicted of fraud and money laundering for their role in an organization called "We The People" that offered to file claims in a class action lawsuit for a fee of $300. The Eighth Circuit upheld the district court's decision to grant them minor role reductions. Two defendants were not directly involved with the conspiracy's banking operations, and their claims-writing activity was significantly less extensive than the other prosecuted claims writer. The other defendant was extensively involved in the group's banking affairs, but his efforts were largely ministerial, and he received very little compensation for his work.) O'Neill's behavior in the instant conspiracy is no more egregious than the cases cited above. The defendant had no understanding or knowledge of the scope and structure of

the scheme. It is clear from recorded conversations with Deveau that O'Neill believed Deveau was also duped by Maggio and that O'Neill is horrified at the loss suffered by CIT. O'Neill's compensation for his role was limited to the kickbacks he received as participation. The kickbacks amounted to a mere fraction of CIT's loss.

On several occasions the government's documents refer to O'Neill's having been paid "$100,000 more or less" yet there is no evidence to support this sum. O'Neill himself has estimated that he received a total much closer to $60,000 (plus a $1,000 cash payment put in his pocket for "air fare"). As the government has not been able to document any payments even close to $61,000, without something more than Deveau's assertions, the court should accept O'Neill's confession.

Basically Michael O'Neill engaged in an unethical arrangement with Jeffery Deveau to accept kickbacks, and that led to his involvement in unlawful actions. At the outset, he was himself deceived, but when he began to become suspicious, he failed to act promptly to stem the damage. He does not deny that his conduct has cost his employer, the CIT Group, over a million dollars in fraudulent loans. For this he is truly remorseful and he knows that he must face the consequences. He has already had to admit his guilt to his wife and children, to the rest of his family, and to the wide circle of personal and professional friends—all of whom have looked up to him as an anchor of stability and a pillar of integrity. He has lost his job and will undoubtedly have a major challenge to find employment again in any field for which he has the training and experience. But letter after letter—from family, friends, work colleagues, agree with the sentiments expressed by William Hakim, owner of a construction company that has built up his company on loans from CIT arranged by Michael O'Neill: "I do know that people err and that an event good or bad can never completely express the total being of a person's experience…I can only imagine the Kafka-type soul searching Michael is living through each day as judgment awaits. I believe he is a good person that can and will rectify his life and that whatever path brought [Michael] to this particular juncture point will never happen again."

**Personal Characteristics of the Defendant**

Michael Riley O'Neill was born into a working class family in Pittsburgh PA, one of seven children living in a small 3-bedroom home. Although his father worked as a paper product salesman, he was finally terminated from Reynolds Paper due to his severe emotional problems. The father was in and out of psychiatric hospitals for many years when O'Neill was a child. As result, the family experienced hard times and O'Neill worked extremely hard as a boy, holding down a succession of jobs such as delivering newspapers and working in a grocery store. Typical jobs for many young boys, but in his case his money went to help support his family.

Any family member would be expected to say good things about their son or brother, but Michael's family cite detail after detail that confirm his own account of his early years. His mother, Rita O'Neill, for example, writes: "I never had to give money to Michael. He paid for his own clothes, entertainment, and school supplies." She goes on to say: "Michael ended up buying the family a car when he was a teen." His siblings are equally able to support this image of Michael. His brother Patrick writes: "Michael did not play sports in high school, due to his desire to work and earn money, to secure a better life for himself, but more importantly, his family as well." His sister writes: "In high school Michael was a hard worker—whether tending bar at the VFW or working in a local meatpacking plant." She goes on to describe his later years: "There were no luxury vacations or fancy cars. Instead Michael was and still is a coupon clipper and an 'on-sale' consumer. He saved his money to help his family." Another brother, Philip O'Neill, a vice-president of Chubb & Son, writes: "Mike has worked hard his entire life, driven solely to provide for his brothers, sister and our

7

father." Another brother, Chris, concludes a long and detailed account of Michael's many qualities: "I could go on and on singing the praises of Mike the brother, son, father and husband; the leader, the strength, the light-hearted, and the unselfish…but I won't….I do not know what kind of picture the government attorney is trying to paint, but look into the eyes of Mike and you will see a caring, respectful, and all-around good guy, someone you would be proud to introduce as your father, husband, son, or brother." And an uncle, John C. O'Neill, a 26-year veteran of the FBI, writes: "He toiled for his family and in doing so helped to keep it a functioning unit. In thinking back on it, I often wonder how the marriage [of Michael's parents] survived but then I know that it survived mostly because of Michael."

One family situation that many of his relatives cite is the case of Michael's older brother, Daniel. He had been a drug abuser and Michael was the one who worked hardest to help him get his life back together; when years later Daniel was dying of cancer, Michael supported him and his family financially and in many other ways. Michael's brother John writes: "It was widely known among members of the O'Neill family that Michael, while providing for his own family, was also giving financial help to Daniel's family."

After graduating from his local high school, he attended Indiana University of Pennsylvania, taking a B.S. degree in business and finance. From the time that he obtained his first job after college, he continued to contribute to the support of his family and he also continued to be generous even as his family grew up and moved on in their own lives. But beyond his financial aid, he was always there to support them in other ways, as letters from his wife, his siblings, and others attest.

In 1982, O'Neill married Cathy Sirignano, a legal secretary at the time they met. They have three children. The oldest, Michael, is a student at Temple University in Philadelphia. The middle child, Eric, is also at Temple, while the youngest son, Christopher, has just started Penn State. O'Neill's wife and sons are all aware of the charges and punishment O'Neill faces and all are 100 % supportive, for as their letters attest, the activity he is charged with does not define the man they know. The man they know is a hardworking man, a devoted husband and father, the mainstay of his extended family.

His wife Cathy, for instance, writes at some length about the time and money and effort that Michael O'Neill has devoted to trying to help her sister who has been a lifelong drug addict; it is almost exhausting just to read about his efforts. Then, too, he expended the same kind of support when Cathy's own brother was dying of AIDS; Michael flew to California and brought the brother back to New Jersey so that he could die surrounded by his family. And as mentioned above, he extended the same kind of financial and emotional support to an older brother, Daniel, when he was dying of cancer, and this support has continued for the brother's widow and two daughters.

Not unexpectedly, Cathy describes in great detail Michael's dedication to their three sons. But what might be suspect as a loyal wife's testimony is here confirmed by letters from his sons, letters that again provide specific after specific of their father's dedication and support. Eric, for example, describes his father's coaching sports teams he was on: "He became a role model and a father figure for every boy on my teams as he taught us each the value of teamwork, the ability to win and lose

9

graciously, and the importance of having fun.  Many kids on the team, including myself, looked up to him as not only a great coach but a great person."   Another son, Mike, confirms this description of his father as a support for his athletic activities  but goes on to conclude: "The most important message to take away from this letter is that my dad is a family man….He is the most decent, generous man I have ever known, and the best role model I have ever had."

   Beyond his family circle, the Michael O'Neill known by his neighbors and community is equally admired.  Since 1988 O'Neill and his family have lived in a relatively modest home in West Chester PA and the sums he is accused of accepting did not result in any dramatic changes or extravagant lifestyle.   Several letters from neighbors and friends confirm that he is a man always generous with his time and money in support of Scouting activities, youth sports, and other families' crises.  It is quite striking—the sheer number and diversity of the testimonials from these individuals, all portraying a caring, honest friend, perhaps most succinctly expressed by Daniel Murphy, who has come to know Michael through their participation in a men's support group: "So who is Mike O'Neill?  He's a good man that made a bad choice."

    Nor do the criminal charges define the man known for years by and through dealings with his many clients and professional colleagues.  As their attached letters attest, many have expressed at first shock, even disbelief,  that the Michael O'Neill they have been dealing with these many years has confessed to such conduct.  They describe his behavior as simply a poor decision, a wrong turn, and all see it as aberrant, completely out of character.   Charles Dolby, a regional sales manager for a

manufacturer of drilling rigs who had commercial dealings with him between 1990 and 2002, states: "I found Mike to be honest, trustworthy, reliable, responsive, considerate, supportive, consistent, versatile aggressive and a man of his word." That "aggressive" might seem to raise a red flag, but in the full context of the letter, it is clear that, as Dolby says, Michael was in a "competitive financing sales" position but acted in a way "that helped him produce for me and my customers." "Aggressive" is not the same as "illegal," and it is important to remember this when it comes to understanding what Michael O'Neill did in arranging for favorable interest rates: he was working in a very competitive world of commercial financing; to obtain contracts for his employer he often did have to seek to adjust interest rates. All of the business colleagues who write letters state that they found him to be completely honest and would gladly work with him again.

There have been collateral consequences as a result of O'Neill's offense that have greatly impacted his ability to earn a living. For one, he was fired from CIT. He will not be able to work as a sales representative as a convicted felon and must create a new career for himself. He has been reluctant to start a search for a new career until this offense is disposed with. Noteworthy is the fact that one month after the FBI first came to Michael's home in West Chester to confront him with the offense, Michael traveled to Boston and gave a proffer to the same agents and the prosecutor. He had hoped to tell all and put this behind him. Unfortunately, Michael did not have a grasp on the whole conspiracy and did not have enough to provide the government to warrant a motion under §5K1. Michael has been living on edge for five years, living off his saving, paying for his boys' education anticipating the end to this case.

11

## Meeting the Purposes of this Sentence

As Michael O'Neill stands now before the Court, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C.§3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct. (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Noteworthy is the manner in which the Sentencing Commission incorporated the purposes of (A), (B), and (C) into the Guidelines:

> The Comprehensive Crime Control Act sets forth four purposes of sentencing. (*See* 18 U.S.C. §3553(a)(2).) A defendant's record of past criminal conduct is directly relevant to those purposes [§ 3553(a)]. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation. *USSG Ch.4,Pt.A, intro.comment.*

The Commission acknowledged that it had made no definitive judgment as to the reliability of then existing data and promised to review additional data insofar as they became available. *id intro.comment.*

To that end, the Commission conducted a study released in May 2004: <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines.</u>[1] "Using data collected from the guideline federal offenders sentenced in fiscal year 1992, the current study examines in detail the predictive statistical power of the criminal history measure..." *Recidivism study pg 2.* This study and another follow-up study Release 2 May 2004: <u>Recidivism and the "First Offender"</u> *id.* Provide data that show a defendant with Michael O'Neill's profile has very little chance of recidivating. A former Commissioner, Michael O'Neill (no relation to the defendant) suggested that a first offender (those without any prior convictions) provision could be incorporated into the guidelines either as a new first offender CHC or as a guided downward departure. The article ended by recognizing the limitations of a first offender analysis without the empirical advantage of recidivism data. *First Offender* pgs 3-4. Thus the Commission published the necessary data in the <u>First Offender</u> study. Interestingly, the Commission has recently decided to work on the Criminal History Category as one of its top priorities.

Finally, the Court is mandated by 18 U.S.C. §3553(a)(6) to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. The government has equated Deveau's culpability to O'Neill's. This equation is more than generous to Deveau who perpetrated the scheme onto O'Neill in concert with Maggio. Deveau cooperated with the government and for his efforts he received a sentence of one year and one day. All things considered, O'Neill's sentence should have some parity with Deveau's inasmuch as O'Neill attempted to cooperate and his culpability is not even in the same realm as Deveau's.

---

[1] This study is available online at the Commission's website, www.ussc.gov/publications/research.

13

Clearly, O'Neill's offense contributed to a major loss for CIT and deserves a sentence that provides some form of punishment. A just punishment, however, need not include a long period of incarceration. The defendant is being punished in many other tangible ways as a result of his offense.

Whether the Court arrives at a guideline range that includes a departure for loss overstating the seriousness of the offense, or relies on the factors at §3553(a), explicated above, or a combination of both, a sentence no greater than one year and one day is sufficient but not greater than necessary to meet the purposes of sentences.

As for restitution, the defendant asks that the court impose a restitution commensurate with his participation in the offense and not as a joint and several liability.

Respectfully submitted,
By his attorney:

*/s/Joseph S. Oteri*
Joseph S. Oteri
Oteri & Lawson, P.C.
20 Park Plaza, Suite 905
Boston, MA  02116
617-227-3700

Date:  October 5, 2006

## CERTIFICATE OF SERVICE

I, Joseph S. Oteri, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 5, 2006

*/s/Joseph S. Oteri*
Joseph S. Oteri