IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| UNITED STATES OF AMERICA | ) CRIMINAL CASE NO. 04-10231-MLW |
| v. | ) |
| PETER V. MAGGIO, III, *ET AL.* | ) |

GOVERNMENT'S SENTENCING MEMORANDUM
RE: DEFENDANT **MICHAEL O'NEILL**

MICHAEL O'NEILL has pleaded guilty to:

Count One -- Conspiracy

Counts Two and Three -- Wire Fraud

Count Six -- Mail Fraud

The Government submits the following matters for this Court's consideration in connection with the sentencing of defendant MICHAEL O'NEILL:

I. The Government did not file objections to the draft PreSentence Report. However, as noted by the Probation Department, the Government reconfirms its commitment to recommend a finding as to defendant O'Neill that the loan amounts aggregated $6,267,099.29 and that the net losses from those loans totaled $2,855,494.05, as set forth in a letter filed with this Court at the change of plea on June 23, 2006.

II. The Government agrees with a technical/typographical correction to the PSR for O'Neill. At ¶ 158, the Government's version of the offense indicated that CIT funded a loan for $558,627 in the name of Paradiso. In fact, that loan was funded by New Court Financial. The factual correction does not impact the letter to counsel filed with this Court at the plea hearing or the calculation of guidelines as to either O'Neill or co-defendant Paradiso.

III. The Government submits the following with regard to the defendant's Objections To The Presentence Report:

A. The defendant comes perilously close to failing to fully accept responsibility.

    1. O'Neill attempts to portray himself as a "victim" of co-defendants Deveau and Maggio, and he apparently asserts that the kickback scheme was contrived by co-defendant Deveau.[1]

        a. O'Neill can hardly be heard to claim "victim" status in the scheme involving CIT loans for which he was a well-paid gatekeeper for CIT, particularly where he used that position to increase his gains by getting kickbacks.

        b. In interviews from the beginning of the FBI investigation, Deveau made clear that it was O'Neill who initiated the kickback payments to O'Neill, and threatened Deveau that he might have trouble financing future equipment sales unless the kickbacks were paid. O'Neill specified that the kickbacks be paid in cash. O'Neill stated that he used his "clout" to push the applications through the CIT financing office. *See* Attachment "A", FBI 302 excerpt of Deveau interview 7/19/00.

        c. Deveau's agreement to wear a "wire" and be monitored delivering payments to O'Niell further evidences the power structure of the kickback relationship. This was further displayed when O'Neill and Deveau met on August 21, 2000, for Deveau to make an additional surreptitious cash payment to O'Neill. It was O'Neill who exercised a prerogative of frisking Deveau.

    2. O'Neill "agreed with all the facts" presented by the government at the plea proceeding, but selectively cites the plea transcript in an attempt to minimize his

---

[1] *See* Def. Obj. ¶11 ("Deveau and Maggio had been receiving fraudulent loan money from other lenders long before *Deveau put out the hook for O'Neill*. *** The kickback process was a separate deal that did, admittedly, bring O'Neill *into the net that Deveau and Maggio created* when they began defrauding various lenders. *O'Neill was but one who fell into the trap*." (emphasis added).

       knowledge of the overarching scheme. *See* Def. Objection 11, citing a portion of the Government's description of his conduct from the Plea Transcript at pp. 27-28.[2] O'Neill neglects prior passages of the same plea transcript where the Government explained:

    a.    O'Neill's criminal involvement commenced sometime after the beginning of 1999. [T. p. 25];

    b.    O'Neill became aware that it was a scheme after the first couple of loans, at approximately the same time as Deveau (i.e., early 1999).[T. p.25-26];

    c.    O'Neill obtained fees from his participation in CIT loans, knowing that they were bogus. [T.p.26].

3.    O'Neill appears to vacillate, applying differing dates and events, regarding "what he knew and when he knew it." The following are taken from O'Neill's September 29, 2006 "Objections To Presentence Report" and his "Response To Government's Statement of Offense", bot filed with the Probation Department:

    a.    "We agree with all the facts [presented by the government at the plea hearing]."[3]  Def. Objection ¶ 11.

    b.    "[T]he government has no evidence that the scope of his agreement with Deveau was to submit phony loan documents to CIT in order to gain fraudulent loans."  Def. Obj. ¶ 236.

        1.    *Cf.*, "The defendant admits that he should have known better when he realized that on the 8/27/99 loan to Didonato that had some phony documents attached to it, that there might have been other phony loan documents." Def. Obj. ¶ 236.

---

[2] Citations to the transcript of the plea hearing are indicated as "[T. ]."

[3] As noted above, the Government's recitation at the plea hearing noted that O'Neill

      c.     "While it is true that O'Neill did forward bogus financials to CIT, O'Neill has no idea the accountant and Deveau were creating bogus documents." Def. Obj. ¶ 52.

           1.     *Cf.*, "O'Neill knew that only some of the loans had phony down payments, namely [three loans on 8/27/99, 10/13/99 and 10/8/99]." Def. Obj. ¶17.

           2.     *Cf., also*, "O'Neill had first hand knowledge that Deveau supplied phony down payment amounts on four of 18 fraudulent loans...." O'Neill's Response to Statement of Offense at 4.

      d.     "[I]t was the end of April 2000 before he began to have some suspicions about some of the borrowers of record...." Def. Obj. ¶47.

           1.     *Cf.*, "O'Neill knew as soon as he met CIT's debtors that they were not legitimate contractors. One customer, Angelo Fenno, could barely speak English and was very old. Another contractor was a young guy who did not appear to know anything about his loan.". O'Neill's Response To Statement of Offense at 4.

           2.     *Cf., also*, "O'Neill learned that the companies were shell companies when he performed his 4/26/2000 audit and not before." Def. Obj ¶17.

           3.     *Cf., further*, "Up to [June 2000] he only had suspicions about several of the borrowers as individuals." Def. Obj. ¶57.[4]

B.     O'Neill declares that the Government's assertion that O'Neill changed numbers on loans refers [only] to his knowledge that some down payments were bogus. This is a

---

[4] *Cf.*, O'Neill's own statements: (1) he was taking kickbacks from early on in the series of Deveau loans, (2) he knew of bogus down payments *at least* in August and October 1999; (3) he knew the DBA's were shell companies *at least* in April 2000; and (4) he took $1,000 from Maggio in April 2000.

4

      misstatement of the Government's position.

    1. The government's evidence is that *O'Neill himself* changed numbers on loan applications to increase loan amounts, thereby further evidencing his knowledge that he was free to manipulate the loans because they were already part of a fraudulent scheme.

    2. Of course, it was <u>also</u> true that O'Neill knew that down payments were bogus.

C. O'Neill declares that the Government's assertion that the Fenno loan was approved based in significant part on O'Neill's recommendation is without a basis in fact. Def. Obj. ¶ 52.

    1. As described in the PSR at ¶52, CIT had rejected any additional loans to Fenno, wanting to wait at least 6 months before financing any additional equipment in his name.

    2. By this time (February 2000) O'Neill had been collecting kickbacks from Deveau for many months.

    3. At least since August and October 1999, O'Neill had known for a fact that related loans in the name(s) of Didonato, Paradiso and Sacco had listed bogus down payments.

    4. O'Neill received a letter from Deveau for forwarding to CIT, promoting Fenno as a successful company bringing in two new contracts.[5] The primary new contract listed was purportedly with Earth Management, which O'Neill knew was related to the prior bogus loans and other loans for which O'Neill was taking kickbacks.

    5. O'Neill's own handwritten notes represent that Fenno was the #1 subcontractor and the new contract with Earth would bring in substantial monthly income for Fenno.

    6. It was O'Neill's forwarding of information and his recommendation to CIT that resulted in CIT funding this

---

[5] The second purported contract was with All Star Construction, supposedly owned and operated by Barry Rubin, a crony of Maggio's, under the same physical location and phone numbers as Earth Management.

        $188,000 loan over its earlier rejection.

D.   To further support his denial of "what he knew and when he knew it", O'Neill makes reference to his email to CIT (Steve Bailey), which reviewed his April 2000 [superficial] audit of loans at Earth Management in Boston. In his Defendant's Objection ¶ 236, O'Neill asserts: "It is inconceivable that O'Neill would have reported to CIT his conversations with Howe if he, O'Neill, was a knowing participant in the full scheme." He refers the reader to a copy of his email to Bailey, attached as Exhibit "C." However:

    1.   By his own present admissions, O'Neill knew as early as the Fall of 1999 that Didonato, Paradiso and Sacco loans contained *at least* bogus down payment information.

    2.   The same email to Bailey reports that O'Neill met with straw borrowers Fenno, Didonato, Havey, Demais, Gaetano and Paradiso, but the email does not disclose what O'Neill already knew about at least some of them.

    3.   By his own present admissions, O'Neill acknowledges that he knew from the April 2000 meeting that the straw borrowers were not legitimate borrowers, but he did not report that fact in his email to CIT.

    4.   In the email to Bailey, O'Neill failed to report that he had taken $1,000 in cash from Maggio during the "audit" of Earth Management loans.

    5.   He knew prior to the April meeting that bogus financials were involved. It appears at best contrived for O'Neill now to say that if he had known of accountant William Howe's participant creating bogus financial documents he would not have mentioned his conversation with Howe in the email to Bailey. But this disclaimer is of no worth when, in that email, O'Neill clearly did mention conversations with others he knew were so involved in the scheme.

IV.   The Government submits the following in response to the Defendants' Sentencing Memorandum:

    A.   Application of U.S.S.G. for Sophisticated Means

    O'Neill asserts that U.S.S.G. § 2B1.1(b)(9)© should not apply

6

for a two-level enhancement. The defendant's argument appears to be that he did not <u>personally</u> employ "sophisticated means" in commission of the offenses.[6]

It is beyond dispute that the facts of this case warrant a finding that the offenses charged involved "sophisticated means" as defined in Section 2B1.1,comment.(n.8(B)). The myriad facts in this case include, but are not limited to: involvement of multiple individuals to stand in as "straw" borrowers in order to conceal the identity of Maggio as the true borrower, the creation of multiple DBA's to conceal the credit [un]worthiness of individual "straw" borrowers, the opening of multiple new accounts in the names of different DBA entities,[7] use of documents reflecting bogus down payments, submission of credit applications containing bogus income and earnings information -- supported by creation of false tax returns and multi-year financial statements, traveling among various states to execute loan documents in various identities, and creation of convoluted paper trails to conceal multiple-financing of individual pieces of equipment. In the aggregate, the activities involved a sophisticated scheme to commit frauds, to

---

[6] Various defendants have raised this same argument regarding application of the enhancement for "use of sophisticated means." Section IV(A) of this Government's memorandum applies with equal force to those co-defendants.

[7] *See, e.g.*, <u>United States v. Janacek</u>, 86 Fed. Appx. 215 (8th Cir. 2003)(sophisticated means applied where defendant "moved embezzled funds through both current and defunct entities in an attempt to conceal the fraud.").

make the transactions look legitimate, and to avoid detection. Indeed, other defendants have implicitly, if not explicitly, acknowledged the application of the enhancement to the overarching case.

Setting aside for the moment the evidence of O'Neill's individual criminal activities, the application of §2B1.1(b)(9)© to this case, and to sentencing of O'Neill, is amply supported by caselaw. Courts hold that where the actions of defendants *when taken as a whole* demonstrate a complex plan, the enhancement applies. *See, e.g.*, United States v. Wu, 81 F.3d 72, 73-74 (7th Cir. 1996)(examining defendant's scheme as a whole to determine the sophisticated means enhancement applied); United States v. Harvey, 413 F.3d 850,l 853 (8th Cir. 2005)(same).

Precisely the approach sought by O'Neill in this case was the basis for remand and resentencing in United States v. Lewis, 93 F.3d 1075, 1081, 1085 (2d Cir. 1996)(discussion of counterpart §2T1.1 in tax prosecutions). The Second Circuit ordered resentencing where the district court did not apply the enhancement for sophisticated means:

> The district court held that even if the overall scheme operated by Abrams Associates was sophisticated, the court would not apply the enhancement because "it was the accounting firm that had devised the scheme, and although clearly the defendant was a willing participant, the defendant did not initiate or create this scheme." In effect, the district court treated the "sophisticated means" provision as a characteristic of the individual defendant rather than as an offense characteristic. In other words, it decided that the enhancement is

>    inappropriately applied unless the individual defendant
>    used sophisticated means.
>    ***
>
>    When a Guidelines provision speaks in the passive
>    voice, we generally consider it to refer to "an offense
>    characteristic, not a characteristic of the individual
>    defendant".
>    ***
>    Consequently, the sophisticated means enhancement applies
>    in the case at hand even though defendant neither devised
>    nor created the criminal scheme in which he participated
>    and from which he benefitted.

93 F.3d at 1083-85. In <u>United States v. Richman</u>, 93 F. 1085, 1088 (2d Cir. 1996), the court again ordered remand and application of the enhancement, declaring:

>    [I]t is of no moment that [defendant] himself neither
>    created nor devised the scheme so long as sophisticated
>    means were used in carrying it out.  Once the factual
>    predicate for the enhancement is satisfied, its
>    application is mandatory."

*See also*, <u>United States v. Cushing</u>, 99 Fed. Appx. 269, 271-72 (2d Cir. 2004)(applying same principle to $24 million securities fraud prosecution).

In <u>United States v. Miles</u>, 360 472, 482 (5th Cir. 2004), the court rejected the defendant's claim that her sentence could not be enhanced for sophisticated means where she did not personally employ sophisticated means.  The court affirmed application of the enhancement because it was reasonably foreseeable by her that co-conspirators would and did use sophisticated means.  Certainly, where O'Neill knew at least as early as August 1999 that bogus down payments were used it was more than reasonably foreseeable by him

that others were using various sophisticated means to carry out fraud. Indeed, O'Neill has conceded that fact.[8]

Moreover, in this case O'Neill personally employed "sophisticated means" to conceal both his own kickback scheme with Deveau and his role in the overarching scheme. In United States v. Anderson, 349 F.3d 568 (8th Cir. 2003) the district court applied, and the appellate court upheld under "clear error" review, enhancement for use of sophisticated means where the defendant claimed that his part was "merely a simple Ponzi scheme" and that he was the "unknowing victim of [third party's] intricate frauds." 349 F.3d at 570-71. The Second Circuit noted that once Anderson became convinced of the third party's Ponzi scheme, Anderson took personal steps to falsely inform investors about both the nature and the safety of their investments. The court concluded:

> Thus, whether or not a "simple" Ponzi scheme would amount to the use of sophisticated means -- an issue we do not address -- the district court's finding that Anderson used sophisticated means to conceal his more elaborate mail fraud is not clearly erroneous.

Id. at 571. O'Neill certainly was aware in mid-1999 that he was gaining kickbacks from what he knew were *at least* very suspicious Deveau-generated loans, and he knew *at least* as of August 1999 that bogus down payments were being reported to obtain CIT loans, yet he used his position to push through fraudulent loans, including the

---

[8] *See, e.g.*, Def. Obj. ¶ 236: "The defendant admits that he should have known better when he realized that on the 8/27/99 loan to Didonato that had some phony documents attached to it, that there might have been other phony loan documents."

use of sophisticated financial records and underwriting documents to make loans appear sound to the CIT finance department. O'Neill acknowledges that of the 29 Deveau loans for which he obtained approval, fully 18 of them **[64%!!]** were fraudulent. Necessarily, this fact makes it clear that O'Neill's personal role involved sophisticated means of concealing the true nature of the Deveau loans for which he caused CIT to approve funding. The "sophisticated means" enhancement is designed to increase punishment where, because of the sophistication of the scheme involved, the defendants make it harder to detect the scheme or calculate the breadth of fraudulent activity. *See, e.g.*, Lewis, 93 F.3d at 1081. O'Neill personally accomplished this throughout the scheme, and particularly when CIT became suspicions and relied upon him to conduct audits on its behalf.

In any event, the overarching scheme clearly involved the use of sophisticated means and that enhancement applies to the sentencing of individual defendants in connection with that scheme.

B.   Application of U.S.S.G. for Abuse of Position of Trust

The Probation Department properly applied a 2-level increase under U.S.S.G. §3B1.3 for O'Neill's abuse of his position of trust. As his own Sentencing Memorandum states:

> "[O'Neill] served as a middleman of sorts, dealing with those engaged in the actual sales and leasing and, upon determining that their applications were in order, passing the paperwork on to his head office at CIT Group." O'Neill Memorandum at 3.

11

O'Neill was the district manager entrusted by CIT to be its "gatekeeper", with the authority to deal directly with dealers and borrowers to evaluate them and their loan applications. Certainly, the company home office in Arizona counted on O'Neill to be its guardian in the field.

The fact that O'Neill knew loans were bogus *at least* as early as August 1999, but continuously pushed them through CIT without the company being able to detect his fraud, shows the level of trust he knew he held in the company. Indeed, during an FBI interview on May 4, 2001, O'Neill declared that he received approvals based on the fact that he was a good salesman for CIT. Moreover, two specific incidents further display how O'Neill took advantage of the confidence and authority CIT placed in him. First, when CIT did not want to consider any additional Fenno loans, O'Neill used his standing and position to override the company's prescient reservations. Second, when CIT was concerned about its millions of dollars of loans placed in Boston, it trusted its Regional Director to conduct an audit to assure the safety of those loans. But O'Neill again used the trust placed in him to perpetuate his fraud.

In short, O'Neill not only violated his position of authority and responsibility, he capitalized on the level of trust placed in him.

C.   Application of U.S.S.G. for Minor Role in the Offenses

O'Neill requests that this Court award him a "minor role adjustment to his guideline calculation."  *See* O'Neill Memorandum at 4.  The breadth and duration of O'Neill's conduct vitiates his claim that he held a smallish role.

First, the evidence shows that O'Neill's knowing criminal conduct lasted from early 1999[9] to June 2000, involved 19 fraudulent CIT loans,[10] and ended only because CIT's suspicions were ultimately leading to an uncovering of the scheme [literally, despite O'Neill's efforts to perpetuate the conspiracy past his sham "audit" in April 2000].

Second, O'Neill's attempt to compare his financial gain to the total losses in this case is wildly illusory.  *See* O'Neill Memorandum at 6. ("The kickbacks amounted to a mere fraction of CIT's loss.")  On that premise, even Maggio could argue that he did not personally net a significant gain from the massive fraud.[11] More importantly, a defendant's role in offenses is not determined by his financial gain.  Indeed, a defendant who receives nothing is nonetheless liable for losses associated with his criminal conduct.

---

[9] *At a minimum* from August 1999 according to the defendant's memorandum.

[10] *See*, Government letter to counsel filed with this Court at the plea hearing.  The defendant acknowledges 18 fraudulent CIT loans.  Def. Obj. ¶ 236.

[11] To the extent O'Neill claims that he received [only] $61,000, he both excludes the sizeable salary he was paid during the time he defrauded CIT, and fails to acknowledge that he earned *at least* as much as several other defendants involved in the conspiracy.

13

Third, as to the kickbacks and salary he took while obtaining approval for the fraudulent CIT loans, O'Neill was the primary movant and was THE beneficiary.

Fourth, whatever initial appeal his claim might seem to carry with regard to the overarching $16 million scheme, O'Neill certainly cannot claim that he had a minor hand in the CIT loans for which the PSR holds him responsible.[12] As was made clear at the plea hearings in this case, defendants could be assigned liability for the entire losses from the conspiracy they joined. Where the PSR already gives O'Neill a reduced level of responsibility – $2,855,494 CIT losses among the $15,731,860 losses from the overarching conspiracy losses -- he cannot escape full liability for that reduced level.

D.   Application of Section 3553 Factors

O'Neill argues that sentencing factors under § 3553 compel a sentence that deviates from the applicable sentencing guidelines. He relies upon the mantra from §3553(a) that the court should identify "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. [Br. at 40]. As the First Circuit has noted, "[t]his pronouncement says nothing about what explanation is required from the district judge, but it is often

---

[12] This analysis applies with equal force to each of the co-defendants who claims a minor role in his offenses, despite the fact that the PSR holds them accountable only for that part of the overarching conspiracy in which they were personally, knowingly and directly involved.

cited by defendants as if it were an admonition to be lenient (and to explain a lack of leniency)." United States v. Navedo-Concepción, 450 F.3d 54, 58 (1st Cir. 2006). On the contrary, "[r]espect for the law, just punishment, adequate deterrence to criminal conduct, and protection of the public certainly do not suggest leniency...." Id. at 58, n. 3.

To support his request that this Court deviate from the guidelines, O'Neill collected a volume of letters from friends and associates. The letters establish that O'Neill was a successful, educated man in a well-paying job with ample family and community support. Thus, his criminal conduct was without excuse and driven by greed.

O'Neill presents considerable support from reliable sources attesting to his financial support in their times of difficulty. As otherwise commendable as that may have been, it must be noted that during his FBI interview in May 2001, O'Neill acknowledged that he used his illegal kickbacks for those purposes.

O'Neill goes to lengths to show this Court that many people, including young people, will be watching his sentencing. O'Neill certainly presents these matters in the hope that this Court will treat him with leniency despite his criminal activities. It is just as important that those watching on O'Neill's behalf and the public at large see that, even for a person who claims to have been a role model for others, there are real consequences when wilful

criminal fraud involves millions of dollars.

Finally, O'Neill acknowledges that a prison sentence is warranted. *See* O'Neill Memorandum at 13-14. To justify a sentence as low as one year and a day, he attempts to make his case parallel to that of co-defendant Deveau, who was sentenced in the Northern District of New York.[13] The suggested comparison is not applicable.[14]

Deveau earned a Section 5K1.1 departure for his cooperation in the investigation and prosecution of this case. He did so by disclosing his own involvement, disclosing the identity and involvement of others, providing affirmative assistance to the Government, and agreeing to testify at trial. In fact, Deveau recorded an FBI-monitored meeting at which he made kickback payments to O'Neill, and was faced with O'Neill frisking him.

By comparison, even at this late date O'Neill still appears to vacillate in the description of his own involvement in the scheme.

Respectfully submitted this 16th day of October, 2006.

                          MICHAEL J. SULLIVAN
                          UNITED STATES ATTORNEY

                By:  /s/ Victor A. Wild
                     VICTOR A. WILD
                     Assistant U.S. Attorney
                     One Courthouse Way

---

[13] Deveau, a resident of Buffalo, New York, pleaded guilty in NDNY pursuant to Rule 20 Transfer.

[14] O'Neill declares that "the government has equated Deveau's culpability to O'Neill's." This is not accurate as to the facts of the case, much less with regard to sentencing.

```
                                        Boston, MA 02210
                                        (617) 748-3100
```

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the attorneys listed below a copy of the foregoing document.

```
                                        /s/ Victor A. Wild
                                        VICTOR A. WILD
                                        Assistant U.S. Attorney
```

| | |
|---|---|
| James M. Merberg, Esq.<br>66 Long Wharf<br>Boston, MA 02110<br>Attorney for Peter V. Maggio | William M. White, Esq.<br>1 Faneuel Hall, 3rd Floor<br>Boston, MA 02109<br>Attorney for Sean Sacco |
| Joseph S. Oteri, Esq.<br>20 Park Plaza<br>Boston, MA 02116<br>Attorney for Michael R. O'Neill | Elliott M. Weinstein, Esq.<br>228 Lewis Wharf<br>Boston, MA 02110<br>Attorney for William A. Howe |
| Scott P. Lopez, Esq.<br>24 School Street<br>Boston, MA 02108<br>Attorney for Louis A. Paradiso | Roger Witkin, Esq.<br>6 Beacon Street<br>Boston, MA 02108<br>Attorney for Matt A. Havey |