IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*****************************************

UNITED STATES OF AMERICA,

v.

JEFFREY A. DeVEAU,

Defendant.

Criminal Action No.
05-CR-219 (NAM)

*****************************************

### SENTENCING MEMORANDUM OF THE UNITED STATES

I.   **NATURE OF CASE AND PROCEDURAL BACKGROUND**

On June 2, 2005, the Defendant, JEFFREY A. DeVEAU, entered a plea of guilty without a written plea agreement, pursuant to Fed. R. Crim. P. 20, to Counts 1-4 and 6 of a Superseding Indictment filed in the District of Massachusetts. DeVEAU admitted to felony violations of Title 18, United States Code, Sections 371 (conspiracy), 1343 (wire fraud), and 1341 (mail fraud) relating to his participation in a scheme to defraud a number of companies that financed the lease and purchase of heavy equipment. This Memorandum is submitted pursuant to the Uniform Presentence Order issued by the Court on June 2, 2005 in anticipation of sentencing, which is scheduled for March 14, 2005 at 10:00 a.m. in Syracuse.

## II. ARGUMENT

### A. Facts

The United States adopts the facts set forth in the Presentence Investigation Report ("PISR") submitted by the United States Probation Office on August 19, 2005.

### B. Calculation of the Sentencing Guidelines Range

Although the imposition of a sentence within the applicable Sentencing Guidelines range is no longer mandatory following *United States v. Booker*, 543 U.S. 220, 245-246, 259, 125 S. Ct. 738, 757, 764 (2005), the Court should still calculate the Guidelines range "in the same manner as before *Booker* . . ." *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005); *United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005). Prior to sentencing, the court must resolve any material issues of fact, and must state its factual findings–by adoption of the Presentence Report or otherwise–on the record in a manner to permit appellate review. *See, e.g., United States v. Jeffers,* 329 F.3d 94, 101-02 (2d Cir. 2003); *United States v. Ben-Shimon,* 249 F.3d 98, 103 (2d Cir. 2001). The Court is authorized to make all factual determinations relating to the Sentencing Guidelines by a preponderance of the evidence, considering any reliable evidence, including hearsay. *See United States v.* Gonzalez, 407 F.3d 118, 125 (2d Cir. 2005)(the power of District Judges to resolve disputed facts by a preponderance of the evidence at sentencing endures *Booker*); *United States v. Martinez,* 413 F.3d 239, 243 (2d Cir. 2005)(neither *Booker* nor *Crawford v. Washington*, 541 U.S. 36 (2004), bars judicial consideration of hearsay at sentencing); *United States v. Crosby*, 397 F.3d at 112, 113.

The United States adopts the offense level computations, the criminal history score, and the resulting Guidelines sentencing range set forth in the Presentence Investigation Report in all respects. The Defendant, through counsel, has objected to one aspect of the Probation Office's calculation of the applicable Guidelines range, arguing that JEFFREY A. DeVEAU should not be deemed personally responsible, under § 2F1.1, for all of the $15,655,337.54 in losses suffered by the victims of the scheme to defraud. The defense claims that DeVEAU should be liable for losses of less than $10,000,000, resulting in a one-level reduction of the total offense level calculated by the Probation Office.

DeVEAU argues that his culpable participation in the fraudulent scheme did not begin until February 1999, when DeVeau assisted Peter Maggio by creating bogus down payment records regarding a New Holland loan of $125,039 in the name of Louis Paradiso for a 1998 JCD Backhoe and other equipment.[1] (PISR ¶ 13) The loans for "sales" by Deveau Ford Tractor from and after February 1, 1999 totaled $13,613,820.40 and created a net loss of $10,143,550.88. (See the attached Schedule, entitled "DEVEAU LOANS SORTED BY DATE," on which the loan numbers have been redacted to the last four digits). Thus, even the most conservative means of calculating the loss attributable to DeVEAU produces a figure of more than $10 million.

DeVEAU acknowledges that, from February 1999 through March 2000, he transmitted $8,217,351.09 in fraudulent loan proceeds to Maggio or related entities. (PISR ¶ 16) However, the "loss" attributable to DeVEAU should not be capped at this $8+ million

---

[1] While there is evidence that DeVEAU acted with fraudulent intent from as early as November 1998, it is not necessary for the Court to rule that he was a knowing participant in the scheme before February 1999, to hold him responsible for a loss of more than $10,000,000.

figure because it does not include the significant portion of the fraudulent loan proceeds that DeVEAU kept for himself. Nor does the $8+ million figure include the fees received by DeVEAU on loans that he brokered, which ranged from $5,000 to $17,000 per loan.[2] The Defendant admits that, from these brokerage fees, he paid more than $100,000 in kickbacks to Michael O'Neill, the collusive sales manager at CIT Group. (PISR ¶ 16) The Defendant's proposed loss figure also omits the losses from other transactions where DeVEAU assisted Maggio and straw buyers in fraudulently obtaining loans, but where the proceeds did not flow through DeVEAU's accounts.[3] Thus, there is clearly probable cause that the loss attributable to this Defendant exceeded $10,000,000.

## III. MOTIONS, APPLICATIONS AND REQUESTS OF THE UNITED STATES

### A. Motion for Downward Departure Under U.S.S.G. § 5K1.1

Pursuant to the provisions of U.S.S.G. § 5K1.1, the United States respectfully moves for a downward departure from the applicable Sentencing Guidelines range for JEFFREY A. DeVEAU for the following reasons provided by the Assistant U.S. Attorney in the District of Massachusetts who is supervising the investigation of the overall scheme:

---

[2] DeVeau advised the FBI that he received that a 1% to 2% commission on each loan, and that a typical $650,000 loan would generate $11,000 in commissions. DeVeau was involved in 41 loans, totaling $13,613,820.40 after February 1999.

[3] The Defendant has admitted that, during his participation in the conspiracy, the gross sales of his business increased from $7 million to $18 million because of his fraudulent involvement with Peter Maggio. (PISR ¶ 27) DeVEAU purported not to be able to calculate the fraudulent profits generated by his participation in this scheme. However, the Defendant acknowledges that his fraudulent loan scheme from Maggio generated the bulk of his business activity and that he gained over $11 million in additional sales plus the brokerage fees he earned for arranging numerous loans. The extent of the Defendant's illicit gains helps establish that there is probable cause to hold him responsible for more than $10 million of the total losses that resulted from the overall scheme.

The FBI investigation in this case showed that JEFFREY DeVEAU had been involved with co-defendant Peter Maggio and others in a fraudulent loan scheme for the purchase of heavy duty construction equipment. Loans involving DeVEAU began in March 1998 and continued until April 2000, ultimately totaling 48 loans aggregating $16,234,073.90. These loans resulted in $11,892,612.64 net losses to lenders.[4]

DeVEAU's first meeting with the FBI was under a proffer letter at the office of his attorney, Edward Menkin, on July 19, 2000 in Syracuse.[5] A month earlier, DeVEAU had resigned from the family-owned business of DeVeau Tractor, Inc. due to his activities relating to this prosecution.

DeVEAU described his meeting with Maggio and his initial involvement to obtain loan financing for Maggio to purchase equipment from other dealers in the name of Maggio's Boston-based company, Earth Management.[6] DeVEAU explained that, after some initial loans, he helped Maggio fraudulently obtain a February 1999 loan for $125,039 from New Holland Credit Company for the purported purchase of a JCB Backhoe and other equipment, when in fact the equipment already belonged to Maggio. DeVEAU detailed his activity on that loan, including falsely representing that equipment was being "sold" by

---

[4] For sentencing purposes, the net losses for 41 loans after February 1, 1999, totaling $10,143,550.88, are attributed to DeVEAU. This figure does not include commissions DeVEAU earned, nor losses where DeVEAU assisted Maggio and "straw borrowers" to obtain refinancing of trucks purchased through O'Connor GMC in Maine.

[5] DeVEAU subsequently spoke with the FBI on eight occasions between August 8, 2000 and September 20, 2000, four times in person and four times briefly by telephone.

[6] Maggio is the undisputed mastermind of the entire loans scheme, and garnered the lion's share of profit from the fraudulent loans. Counsel has advised that Maggio will plead guilty to the indictment in this case, representing the fourth federal prosecution of Maggio in five years.

DeVeau Tractor to Earth Management, falsely representing a fictitious $16,000 "down payment", and receiving a finance commission for DeVeau Tractor on the loan.

DeVEAU detailed subsequent fraudulent loans for Maggio in which DeVEAU knowingly participated by, among other things: (1) reporting fictitious "sales" by DeVeau Tractor, (2) listing fictitious down payments by "straw" borrowers on loan applications, (3) reporting fictitious "first and last" payments on loans for equipment lease agreements, and (4) creating multiple loans to avoid lender limits of $1 million credit limit per piece of equipment. DeVEAU provided a two-page spreadsheet of the subject loans and equipment. DeVEAU acknowledged that when lenders required evidence of down payments regarding loans for the leasing of equipment, the amount of the down payment reduced his profits and that he initially made up the down payments to avoid telling Maggio how much profit DeVEAU was making. DeVEAU stated that he later explained to Maggio how large down payments were impacting his profits and Maggio agreed to pay DeVEAU a 2% kickback. In short, DeVEAU provided an extensive outline of the entire fraudulent loan scheme, provided valuable information about Maggio, and was candid about his own involvement.

DeVEAU also provided detailed information regarding Michael O'Neill, a representative for CIT Financing who demanded commission kickbacks to push through CIT loan packages. From information provided by DeVEAU, O'Neill has been indicted as a co-conspirator in the current indictment. DeVEAU stated that O'Neill required kickbacks on every loan after June 1999, and that he paid O'Neill approximately $100,000. DeVEAU's review included specifics of loans where O'Neill created additional commissions by raising the down payments and sales prices DeVEAU had listed. DeVEAU reviewed

specific conversations where O'Neill further disclosed his knowledge of the fraudulent nature of various loans. DeVEAU further assisted the FBI on August 21, 2000 by wearing a recording device to meet with O'Neill and deliver a controlled kickback payment of $2,000 cash. Although DeVEAU was never at risk of harm, O'Neill did state that he was very paranoid and conducted an amateurish "pat down" of DeVEAU which did not disclose the recording device.

In reviews with the FBI, DeVEAU also described meetings with Louis Paradiso, Matt Havey and Sean Sacco, individuals charged as co-defendant "straw" borrowers in the indictment in this case.

DeVEAU also provided information regarding William Howe, an accountant who provided false financial information in support of the fraudulent loans. Howe is also charged in the indictment, and is expected to plead guilty.

DeVEAU also provided information supplementing an FBI investigation of Patrick D'Andrea, the owner and operator of an equipment dealership in Rochester, New York. D'Andrea and Maggio were indicted and pleaded guilty to obtaining a fraudulent $168,000 loan for the fictitious purchase of construction equipment.[7]

Based upon the above information, the United States believes that a downward departure under § 5K1.1 to a Guidelines range of between 12 and 18 months is fair, reasonable and appropriate.

---

[7] In 2003, D'Andrea was sentenced to 3 years probation, 6 months home detention, and $80,000 restitution. Maggio was sentenced to 24 months in prison, concurrent with a 51 month sentence he received in October 2002 on another fraudulent loan scheme.

### B.    Opposition to Downward Departure Under U.S.S.G § 5K2.0

The Defendant's Sentencing Memorandum suggests that the Court should depart downward under § 5K2.0 of the Sentencing Guidelines based on several factors that are not extraordinary and/or are otherwise taken into account by the Guidelines. Although the Defendant was initially drawn into this offense as an innocent dupe and had not been involved in any prior criminal conduct, a downward departure for "aberrant behavior" under § 5K2.20 is not warranted. The Defendant's admitted participation in this complex scheme did not involve only a single criminal transaction, was not of limited duration, and involved significant planning. U.S.S.G. § 5K2.20(b). From February 1999 to April 2000, the Defendant knowing and directly participated with Maggio in an elaborate scheme by which they obtained 41 different fraudulent loans, totaling more than $13 million.

The argument that this case has been "hanging over the head" of the Defendant for the five years, while he has been allowed to cooperate with the United States and delay any incarceration for his extended participation in a multi-million dollar fraud scheme, would hardly justify a departure. And, the cooperation of the Defendant has been taken into account by the fact that the United States has made a motion under U.S.S.G. § 5K1.1 and recommended a substantial departure.

The United States respectfully requests notice and an opportunity to be heard if the Court is considering whether any other downward departure from the applicable, advisory Sentencing Guidelines range may be appropriate in this case. See United States v. Jagmohan, 909 F.2d 61 (2d Cir. 1990).

### C. Ex Parte Communications With The Court

The United States respectfully requests that the Court provide the parties with any ex parte communications received by the Court in connection with the sentencing in this case with the exception of the confidential sentencing recommendations submitted by the United States Probation Office.

### D. Payment of Financial Obligations

The imposition of an order requiring payment of restitution in full, according to a schedule set by the Court, is mandatory pursuant to Title 18, United States Code, Sections 3663A(c)(1)(A) and 3664(f). The Defendant's restitution obligation should be joint and several with coconspirator Peter Maggio, who is facing federal charges in the District of Massachusetts.

We respectfully request that the Court order immediate payment, in full, of the special assessment. Given the information about the Defendant's financial condition set forth in the Presentence Investigation Report, we agree with the Probation Office that the Defendant is not in a position to pay a fine in addition to the substantial restitution for which he will be responsible.

## IV. GOVERNMENT'S RECOMMENDATION WITHIN GUIDELINES RANGE

While the Court has the discretion to impose a sentence outside of the applicable Sentencing Guidelines range after *Booker*, the sentence must be reasonable based upon consideration of all relevant factors, including the applicable Guidelines range. *United States v. Booker*, 543 U.S. at 261, 125 S. Ct. at 765-766. The Sentencing Reform Act

> . . . requires judges to consider the "Guidelines" sentencing range established for . . . the applicable category of offense committed by the

> applicable category of defendant,' [18 U.S.C.] § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) . . . . And the Act . . . requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care. § 3553(a)(2) . . . .

*United States v. Booker,* 543 U.S. at 259-260, 125 S. Ct. at 764-765.

To the extent the Court imposes a sentence outside of the calculated Guidelines range, 18 U.S.C. § 3553(c) requires a specific statement of reasons both in open court and in writing. *United States v. Crosby,* 397 F.3d at 116 ("We note that, in *[Booker]*, the Supreme Court left unimpaired section 3553(c), which requires a district court to 'state in open court the reasons for its imposition of the particular sentence' and, in subsection 3553(c)(2), to state in writing 'with specificity' the reasons for imposing a sentence outside the calculated Guidelines range.") *See also United States v. Lewis,* 424 F.3d 239, 249 (2d Cir. 2005) (remanding because, in imposing sentence for supervised release violation, district court failed to state sufficient reasons for imposing sentence outside the range recommended by Guideline policy statements).

The Government respectfully contends that the most lenient sentence within the 12 to 18 month Guidelines range applicable after the recommended departure under U.S.S.G. § 5K1.1, would be reasonable and appropriate based upon all of the relevant sentencing factors. Although the Defendant had no prior criminal record and was drawn into criminal activity by a more culpable coconspirator, his sentence should reflect the fact that he was an active and substantial participant in a multi-million dollar fraud scheme. The Government's recommendation under § 5K1.1 adequately recognizes that the Defendant

-10-

has tried to make amends for his criminal activity by, *inter alia*, full and candid cooperation with the United States in the investigation and prosecution of others.

## VI. <u>CONCLUSION</u>

The United States respectfully contends that the recommended sentence is consistent with the United States Sentencing Guidelines and is a reasonable and appropriate sentence.

Respectfully submitted,

GLENN T. SUDDABY
United States Attorney

/S/

By:  Andrew T. Baxter
Assistant U. S. Attorney
Bar Roll No. 101114

-11-