UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA }<br>}<br>}<br>v. }<br>}<br>MICHAEL O'NEILL } | CRIMINAL NO: 04-10231-MLW |

**DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM**

Now Comes Michael O'Neill, who respectfully files this supplemental sentencing memorandum in support of his request for a reduced sentence pursuant to 18 U.S.C. §3553(a) and (a)(6) in addition to and in combination with the other grounds identified in his original sentencing memorandum. Additionally, defendant states that this Court has the discretion and should reduce Mr. O'Neill's sentence in order to avoid an unwarranted sentence disparity between him and another co-defendant, Jeffrey Deveau for the reasons discussed below.

**Deveau's Role and The Government's Sentencing Recommendation**

Mr. Deveau's conduct and role in the offense is easily contrasted with that of Mr. O'Neill on a number of fronts. First, Deveau was involved in the scheme at a much earlier stage and involved in significantly larger losses than O'Neill. See Sentencing Memorandum of the United States in US v. Deveau, Cr. No. 05CR219 (ND NY) attached as Exhibit 1. His involvement began in June 1998 and involved over 41 loans and over $15 million in losses. Exhibit 1, at 4. See Deveau Loans Sorted by Date and Judgment

1

and Commitment Order in Deveau's case attached respectively as Exhibits 2 and 3.  Mr. O'Neill did not knowingly begin to participate in the scheme until sometime in mid 1999 and his losses involved approximately $1.8 million as stipulated to by the parties.

Second, as Mr. Deveau was closely associated with Maggio, who was the prime architect of this and many other related financial frauds, he was privy to the scope and extent of Maggio's scam as well as his own.  Exhibit 1, at 5.  While he may not have been the architect of the original scam, he certainly was a close associate of Maggio's and used the sophisticated tools of the fraud to the benefit of his company.  As discussed above, these scams were integral to the success of Deveau's company and helped increase his revenues from $7 million to $18 million.  O'Neill, on the other hand, was merely a cog in a smaller part of the scam.

It should be noted that the government did not seek an upward adjustment for Deveau for use of sophisticated means in his New York case.  The U.S Attorney's Office did move for such an adjustment in O'Neill's case despite the obvious inequity between these two parties.

Third, while Maggio was the prime architect of the entire scheme, Deveau orchestrated and coordinated the illegal conduct in concert with Maggio.  Exhibit 1, at 5-6.  The fact that Deveau and Maggio had been engaging in an ongoing scheme to defraud various lenders for quite sometime, demonstrates that he not only concocted the scheme, but solicited and managed O'Neill's involvement in the fraud itself.   Despite the strong evidence that Deveau should have gotten an upward role adjustment, the government did not advocate for one and the sentencing court did not give him one.  Exhibit 1.

Fourth, the profit that Mr. Deveau earned from the scheme was significant and dwarfed O'Neill's involvement . While Mr. Deveau's business income increased by $11 million dollars because of his fraudulent dealings with Maggio, Mr. O'Neill earned a modest profit of $61,000.00 from his involvement in the scheme with Deveau. Exhibit 1 at 4, fn 3.

Despite these major differences in role, conduct, and profiteering from the scheme between Mr. O'Neill and Deveau, the government apparently did not recommend that Mr. Deveau get an enhancement for role in the offense or for sophisticated means. Exhibit 1. The U.S. Court in the Northern District of New York ultimately calculated Mr. Deveau's offense level at 20 and his sentencing range between 33 and 41 months.[1] Exhibit 3. In fact, the US Attorney's Office is seeking a higher guidelines offense level for Mr. O'Neill than it did for Deveau; recommending a guideline level of 21 with a sentencing range of 37 to 46 months,[2] while ignoring the disparities in roles between these men.

## Respect For The Administration Of Justice And U.S. v. Thurston

While the government may argue that this guideline sentence discrepancy is attributable to the fact that O'Neill will likely be assessed two levels for abuse of trust, this view ignores the fact that the NY U.S. Attorney's Office failed to request enhancements for Deveau's role in the offense or sophisticated means. It also fails to

---

[1] The Court granted the government's 5K1 motion for Mr. Deveau and departed from the guideline sentence to 12 months and a day.

[2] If all things were equal, Deveau's offense level should have been 5 levels higher than Mr. O'Neill's (or 7 levels higher than argued by the NY prosecutor). This assumption includes a 3 level difference because Deveau's losses were more than $10 million while O'Neill losses involved more than $1.5 million pursuant to 2F1.1. Additionally, a 2 level increase for sophisticated means should have been added plus at least 2 more levels for Deveau being a manager of the conspiracy. Apparently, none of these positions were advocated by the U.S. Attorney's Office in NY.

take into account that Mr. Deveau was involved in over $15 million dollars worth of losses from which he personally benefited, while Mr. O'Neill was only involved in $1.8 million and received only $61,000 in payments for his participation in the scheme. Additionally, Mr. Deveau was a more culpable conspirator given his direct relationship with the notorious Maggio and their collaboration on dozens of fraudulently designed loans that led to Deveau's business income increasing from $7 million to $18 million dollars over that period. Exhibit 1. Therefore, the sentence recommendation of 31 to 41 months for Mr. Deveau pre 5K1 motion as compared to Mr. O'Neill and others similarly situated not only creates an unwarranted sentence disparity between these two defendants, but is also an affront to the principle that encourages national uniformity of sentencing.

Therefore, there is clear evidence that even before Deveau was granted a 5K1 departure for his cooperation, there are numerous factors that support a finding that the guideline calculations for these two men creates an unwarranted disparity in sentences that could negatively impact the public's confidence in our judicial system. This disparity continues, however, even after Deveau's 5K1 departure is granted, given the fact that Mr. O'Neill attempted to cooperate immediately upon learning he was under investigation. Ultimately, Mr. O'Neill did not receive a 5K1 primarily because he was a "small fish" and could not compete with Deveau whose intimate and pervasive involvement in the larger conspiracy made him more valuable to the government than O'Neill. Defendant submits that this difference is also a legitimate consideration for this Court in deciding what sentence to fashion for Mr. O'Neill to, again, ensure that the public does not lose confidence in the administration of justice. See United States v.

4

Thorton, 2006 WL 1901035 (10th Cir. 2006)(defendant can argue that he should get a lower sentence pursuant to §3553(a) than a more culpable person in the conspiracy even if that more culpable person cooperated at trial)

Defendant's position is supported by the Court of Appeals for the First Circuit. In United States v. Thurston, the trial court reduced Thurston's 60 month guideline sentence to 3 months after considering the factors outlined in 18 U.S.C. §3553(a).[3] United States v. Thurston, 456 F.3d 211, 21-215 (1st Cir. 2006). In support of that sentence reduction, the trial court considered sentencing factors contained in 18 U.S.C. §3553(a), adopted the previous findings of the first sentencing court and found, according to the reviewing court, that a three month sentence was appropriate given: (1) a wide sentence disparity between Thurston and his co-defendant (Isola) was unwarranted as it would punish Thurston for going to trial; (2) Thurston's offense was not terribly serious; and (3) this sentence would act as a sufficient deterrent to future white collar criminals as they were typically worried more about whether they were going to jail rather than the length of sentence. Id at 212-215. The factors adopted by the trial court and included in its rationale for reducing Thurston's sentence included his "extraordinary" good works and the fact that Isola was the prime architect of the scheme. Id.

The First Circuit reversed Thurston's sentence on grounds that the sentence reduction of 57 months, or 95%, was unreasonable under the circumstances. Id at 215. The Court held that this reduction was not warranted for various reasons including (1) the trial court did not give "significant consideration to encouraging nationwide uniformity in sentencing—the primary focus of §3553(a)(6)." Id at 216;  (2) "even if the emphasis on

---

[3] In fact, two separate District Court judges reached the same conclusions about not only the extent of Thurston's reduction but also the reasoning behind the reduction.

5

codefendant disparity was appropriate",[4] the First Circuit found that the codefendants' "were not so similarly situated that nearly identical sentences were warranted"; (3) the trial court undervalued the plea process that resulted in Isola pleading "nolo contendere" and getting a probationary sentence and the potential risks associated with Thurston's decision to go to trial, and (4) as the fraud involved $5 million, Thurston's crime was quite serious. Id.

The First Circuit provided guidance to the trial court upon remand, which is pertinent to the instant case. First, the Court stated that the trial court could consider a person's good works when considering whether a shorter sentence was appropriate. Id at 219. Second, the Court stated that it was legitimate for the district court to also consider whether the sentences were so disparate between the two defendants that the "public's respect for the law" would be negatively impacted. Id. 220.[5] Consequently, "[a] sentencing court could plausibly conclude that extremely divergent sentences would undermine the accepted notion that similar conduct should be punished in a somewhat similar way." Id.

The logical extension of the First Circuit's "accepted notion" principle is that a person who is a more culpable offender should receive a higher sentence than someone who is less culpable in the scheme. This is reflected in both the guidelines sections that reference aggravating factors (i.e., role in the offense) and in pre- Booker cases that permit upward and downward departures on such grounds. See United States v. Ravelo,

---

[4] But see United States v. Pisman, 443 F.3d 912 (7th Cir. 2006)

[5] In fact, during Mr. Thurston's sentencing the AUSA agreed that that disparity between defendants in the same case was an appropriate consideration for the court in determining whether a sentence should be reduced, but noted that national uniformity principles should be given greater weight. See Excerpts from Sentencing Transcript in United States v. William Thurston, 98CR10026 (June 15, 2006 DC MA, Wolf, J.) attached as Exhibit 4, at 2.

370 F.3d 266, 275 (2nd Cir. 2004)(loss overstates defendant's involvement in the scheme) The First Circuit has repeatedly upheld that ground not only for sentence reduction purposes but also for departure grounds. Id at 219.

Even more so than the defendants in Thurston, Mr. O'Neill's guideline sentence seems not only to exaggerate the seriousness of his own conduct, but overly minimizes the role of his codefendant.[6] While Mr. Deveau may not be the architect of the fraud, he certainly played a more significant role than O'Neill, was more familiar with the extent and scope of the fraud and, unlike O'Neill, was close friends with Maggio, the principle of the fraud.

The government's failure to advocate for more serious guideline enhancements for Deveau, while seeking them for O'Neill places the two defendants and others similarly situated on a national scale on unequal footing for no explicable reason.[7] Both men pled guilty in advance of trial and both men cooperated with the government almost immediately, which evidences remorse and a change in attitude. Therefore, the First Circuit's criticism in Thurston that the trial court failed to appreciate the propriety of a prosecutor seeking higher penalties post trial is not present in Mr. O'Neill's case.

---

[6] Its worthy of note that Thurston was involved in the entire $5 million Medicare fraud while Mr. O'Neill was involved in one tenth of the overall fraud conducted by Deveau or approximately $1.8 million. So even by objective standards, the harm caused by Mr. O'Neill is far less serious than not only Deveau and his cohorts, but also Thurston.

[7] When this Court was sentencing Thurston, it stated that: "The Guidelines were intended to diminish the unwarranted disparity that Congress and the President felt had resulted from decisions made publicly by neutral judges. The Guidelines were not intended to authorize unwarranted disparity created by prosecutors who are not neutral and who do not have to explain their decisions publicly." United States v. William Thurston, 98CR10026 (June 16, 2006 DC MA, Wolf, J.) attached as Exhibit 5, at 2. This Court further stated that "there can be cases in which the disparity in sentencing between similarly situated codefendants would be so pronounced that to impose those disparate sentences would injure respect for the law and confidence in the administration of justice." Ibid at 3. This is one of those cases.

In fact, another inequity arises in Mr. O'Neill's case, which creates further sentence disparity and concern that the public will lose respect for the administration of justice. This arises from the fact that both O'Neill and Deveau cooperated but Deveau was the only one who the government decided was worthy of a 5K1 motion. The basis for the government's decision making process, while legitimate under the present rules in place, further ferments public disrespect toward the sentencing process. It is difficult for a layperson to understand why Deveau, who was higher up in the scheme and a "bigger fish" in the conspiracy, could cooperate and get a sentence of one year and a day while Mr. O'Neill, whose cooperation was rejected because he was a "smaller fish", is looking at a significantly higher sentence.

The reality is that Mr. O'Neill wanted to cooperate but did not have any additional information than what had already been provided by Deveau. He did not have the quantity and quality of information that Deveau had, because he was not as involved in the fraud and its orchestration as Deveau and Maggio were. While the policy decisions behind granting Deveau a 5K1 and rejecting one for Mr. O'Neill may be appreciated by prosecutors and judges, the public does not take comfort with such apparent inequities in our sentencing system. Consequently, defendant submits that the disparity in sentencing created by this type of cooperation scheme is a basis for this Court to further reduce Mr. O'Neill's sentence. Again, this will ensure that the public does not lose confidence in the administration of justice.

Even if, arguendo, the apparent inequities caused by the government's decision to work with a highly culpable conspirator (Deveau) while rejecting the cooperation of a less culpable person (O'Neill) is not a legitimate basis by itself to reduce Mr. O'Neill's

sentence pursuant to §3553(a)(6), this Court can certainly consider his attempt to cooperate pursuant to the broader goals of §3553(a) given Mr. O'Neill's timely and forthright confession together with his willingness to cooperate and assist the government in its investigation. See <u>United States v. Fernandez</u>, 443 F.3d 19, 33 (2nd Cir. 2006)[3553(a) is broad enough to encompass characteristics such as remorse and rehabilitation as evidenced by unsuccessful attempts to cooperate]  While it may not have risen to the level of "substantial cooperation" in the yes of the U.S. Attorney's Office, it certainly reflects true remorse without concern about the consequences of his confession, a desire to change his life and to return to his good works amongst his family and friends. While Mr. O'Neill made a serious mistake, his cooperation with the government, when taken together with his exemplary personal history in the period before these crimes, suggests that he is a man who will improve his life upon release from jail and make amends in extraordinary ways.

Consequently, defendant moves this Court to reduce his sentence based upon the considerations raised in his original sentencing memorandum as well as pursuant to 18 U.S.C. §3553(a)(6).  Whether the Court arrives at a guideline range that includes a departure for loss overstating the seriousness of the offense, or relies on the factors at §3553(a), as discussed above and in his original sentencing memorandum, or a combination of both, a sentence no greater than one year and one day is sufficient but not greater than necessary to meet the purposes of sentences.  This will maintain public confidence in the administration of justice, and is consistent with the principles and factors enumerated in §3553(a) by Congress.

As for restitution, the defendant asks that the court impose a restitution commensurate with his participation in the offense and not as a joint and several liability.

Respectfully submitted,
By his attorney:

*/s/Joseph S. Oteri*
Joseph S. Oteri
Oteri & Lawson, P.C.
20 Park Plaza, Suite 905
Boston, MA  02116
617-227-3700

Date:  November 13, 2006

### CERTIFICATE OF SERVICE

I, Joseph S. Oteri, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 13, 2006.

*/s/Joseph S. Oteri*
Joseph S. Oteri